IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CPC PARTNERS, LP, a Utah limited partnership;<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>CHRISTOPHER P. CREAGAN and SHELBY CREAGAN, husband and wife and the marital community comprised thereof; THE ESTATE OF DAVID ALLEN CREAGAN and BRENDA CREAGAN, deceased husband and wife and the marital community comprised thereof,<br><br>　　　　　　　Defendants. | Case No. |

**COMPLAINT FOR FRAUD**
<u>**IN CONNECTION WITH THE SALE OF SECURITIES**</u>

Plaintiff CPC Partners, LP, by and through its counsel, and for causes of action against Christopher P. Creagan and Shelby Creagan (collectively "C. Creagan"), and The Estate of David Allen Creagan and Brenda Creagan (collectively, "D. Creagan") (C. Creagan, and D. Creagan are collectively referred to as "Defendants"), hereby allege as follows:

**I.　　PARTIES AND JURISDICTION**

1.　　Plaintiff CPC Partners, LP ("CPC" or "Plaintiff") is a Utah limited partnership. It has satisfied any and all prerequisites to maintaining this action.

2.　　Defendants Christopher P. Creagan and Shelby Creagan are husband and wife that during all relevant times resided in and/or conducted business in Cowlitz County, Washington.

3.  Defendants David Allen Creagan (now through the Estate of David Allen Creagan) and Brenda Creagan were husband and wife that during all relevant times resided in and/or conducted business in Cowlitz County, Washington. All acts performed by David and Brenda Creagan were done on behalf of their marital community.

4.  This Court has subject matter jurisdiction pursuant to 15 U.S.C § 77l (Section 12(a)(2)) of the Securities Act of 1933 ("Securities Act") and 15 U.S.C. § 78j(b) (Section 10(b)) and the corresponding CFR 10(b)-5 ("Rule 10(b)-5") of the Securities Exchange Act of 1934 ("Exchange Act").

5.  Further, this Court has jurisdiction over all state claims due to supplemental jurisdiction, as all claims are substantially related to the federal securities claims, so they form part of the same case and controversy.

6.  Venue is proper in this District because the Equity Purchase Agreement contains an exclusive forum selection clause stating that Delaware is the exclusive forum for any disputes arising from or relating to that agreement.

## II.   FACTUAL ALLEGATIONS

7.  On or about December 31, 2020 (the "Closing"), CPC entered into an Equity Purchase Agreement (the "Agreement") with Defendant C. Creagan in which CPC acquired an eighty percent (80%) equity interest (the "Equity Interest") in CPC Holdco, Inc., a Washington corporation ("Newco"), which owned all the equity in Columbia Pacific Construction, LLC, a Delaware limited liability company (the "Company") (the "Agreement").

8.  As part of the transaction by which CPC effectively acquired the Equity Interest in the Company and thus controlling interest in the Company, the Company concurrently

entered into the following: (i) Employment Agreement, dated effective as of January 1, 2021, by and between the Company and C. Creagan, and (ii) the Employment Agreement, dated effective as of January 1, 2021, by and between the Company and D. Creagan (collectively, the "Employment Agreements"). Pursuant to the Employment Agreements, C. Creagan and D. Creagan agreed to "expend [his] best efforts on behalf of Company and its subsidiaries," to "act in the best interest of Company at all times," and to "devote substantially all of [his] business time and efforts to the performance of [his] assigned duties for Company." A critical component of CPC purchasing the Company was the representation and inducement provided by Defendants that they would continue to work full-time on behalf of the Company and continue to bring in and run the business as they had been doing before Closing.

9. After the Closing, C. Creagan checked into a rehabilitation center and D. Creagan took multiple long trips out of the country. In addition, Defendants failed to devote substantially all of their business time and efforts to the Company as required under the Agreement and the Employment Agreements, either by not showing up for work or spending a substantial amount of their business time and efforts pursuing other ventures. Despite Defendants' failures to comply with the terms of the Agreement or the Employment Agreements, the Company continued to pay them compensation as if they were working full-time for the Company in compliance with the Agreement and the Employment Agreements.

10. Defendants' breaches of the Agreement severely damaged the Company, as it lost existing customers and failed to secure business it should have secured from future customers.

11. Defendants essentially abandoned their jobs at the Company after Closing.

12. Sometime after Closing, CPC started to uncover problems with the Company's operations. Upon further investigation, they learned that Defendants had made many misrepresentations to induce CPC to enter into the Agreement. They also came to learn that Defendants omitted to tell them of a number of very significant pre-Closing problems that had Defendants properly disclosed the information to them, they would have declined to enter into the Agreement.

13. Under Section 5.2 of the Agreement, Defendants agreed to indemnify and hold harmless Plaintiffs from and against all losses that are sustained by them arising out of or relating to, among other things, any breach of any representations or warranties made by (i) C. Cregan or Newco in Article II of the Agreement, or (ii) the Company in Article III of the Agreement.

14. Accordingly, Plaintiffs provided written notice of claims for indemnification pursuant to Section 5.4 of the Agreement to Defendants with respect to the following losses sustained or incurred by Plaintiffs:

    A.    $7,520,000 of losses related to Bonneville Power Administration and its affiliates ceasing to do business with, reducing the level of business with, or otherwise altering their relationships with, the Company or its affiliates after the Closing. Among other things, Defendants breached Section 3.22(a) and Section 3.6(g) of the Agreement by representing and warranting that no Material Customer intends to or will reduce its business with the Company from the levels achieved during the twelve months ended December 31, 2019, and that no Material Customer intends to modify its relationship with the Company in a manner less favorable to the Company. In addition, there are further losses to be

    determined as a result of Jim Creagan's provision of goods, work, services, or other benefits to employees, contractors, agents, or other persons related to or associated with Bonneville Power Administration or its affiliates in breach of, among other things, Section 3.25, Section 3.14, and Sections 3.6(e) and (g) of the Agreement.

    B.    $100,000 of losses as a result of modifications that were made to the DEF chip systems of certain of the Company's trucks or other equipment prior to the Closing, in breach of, among other things, Section 3.12, Section 3.14, and Sections 3.6(e) and (g) of the Agreement.

    C.    $2,000,000 of losses as a result of certain equipment necessary, used or intended for use in the Business being sold without replacement and outside of the ordinary course of business prior to the Closing in breach of, among other things, Section 3.7, Section 3.17(a), and Section 3.6(g) of the Agreement.

    D.    $6,880,000 of losses as a result of certain projections provided to the Buyer Indemnified Parties by the Seller Parties or their affiliates or representatives that were not true or accurate.

(Collectively the "Claims").

    15.    Defendants failed and/or refused to indemnify Plaintiffs from any of the Claims, specifically failing and/or refusing to provide indemnification in the amount of the Claims equaling $16,500,000 (the "Indemnification Amount").

    16.    In addition to the Claims, CPC learned sometime after Closing that Defendants had made various misrepresentations to them, some of them false statements and some of them material omissions, each of which had they not been made CPC would not have

completed the transaction and would not have bought the Equity Interest in the Company. These misrepresentations include, but are not limited to the following:

    A.    That the Company's relationship with its single largest customer, BPA, was strong when in fact Defendants knew this was false. Specifically, but without limitation, Defendants did not disclose that prior to Closing, D. Creagan had engaged in a very heated exchange with BPA and BPA had advised Defendants that it no longer desired to work with the Company any longer. This representation was made several times, but it was first made by both D. Creagan and C. Creagan to Plaintiff's representatives Chad MacKay and Jim Nelson in July 2020. In this conversation, and reiterated at various times in July through December (both in person and on the phone), Defendants represented that "no one was doing the work for [BPA] that [the Company] was doing;" "[the Company] had a unique relationship with [BPA] that was proprietary to them;" "the relationship with BPA was solid;" "[the Company] has a $51 million dollar contract with BPA and we are certain that BPA will honor the contract for its duration." Defendants did not say that the Company had any problems with BPA and did not disclose this heated exchange between D. Creagan and BPA where BPA advised the Defendants that it was no longer going to use the Company. Had Defendants told the truth, and not made this misrepresentation, Plaintiff would not have gone through with the subject transaction and purchased the Equity Interest, thus saving for itself the Purchase Price and being able to use those monies to invest in other profitable adventures. As a result of this misrepresentation, Plaintiff did purchase the Equity Interest and after

      Closing learned of BPA withdrawing the bulk of its business from the Company, which severely reduced the Company's revenues and caused it to ultimately go out of business.

B. That the Company's business with its single largest customer, BPA, was not at risk of loss when in fact Defendants knew this was false. Specifically, but without limitation, Defendants did not disclose that Jim Creagan, brother to D. Creagan and uncle to C. Creagan, had been working with the Company's fencing contractor (the contractor the Company had used for years on its BPA projects) to steal the BPA business from the Company and move it to a new company owned and/or run by Jim Creagan and the fencing contractor, and bypassing the Company. Plaintiffs ultimately learned that before Closing Jim Creagan had reached out to the Company's bonding representatives and asked them if it could do the bonding for the work if they did it without the Company; Defendants knew of these facts and never disclosed them to Plaintiffs, especially before Closing. This representation was made several times, but it was first made by both D. Creagan and C. Creagan to Plaintiff's representatives Chad MacKay and Jim Nelson in August 2020. In this conversation, and reiterated at various times in August through December (both in person and on the phone), Defendants represented that "no one was doing the work for [BPA] that [the Company] was doing;" "[the Company] had a unique relationship with [BPA] that was proprietary to them;" "the relationship with BPA was solid;" "[the Company] has a $51 million dollar contract with BPA and we are certain that BPA will honor the contract for its duration." Defendants did not say that

the Company had any problems with BPA and assured Plaintiff that the $51 million contract would be honored by BPA for its duration and Plaintiff was effectively guaranteed payment of $51 million from BPA in exchange for the Company providing the agreed upon services. Had Defendants told the truth, and not made this misrepresentation, Plaintiff would not have gone through with the subject transaction and purchased the Equity Interest, thus saving for itself the Purchase Price and being able to use those monies to invest in other profitable adventures. As a result of this misrepresentation, Plaintiff did purchase the Equity Interest and after Closing learned of BPA effectively cancelling the $51 million contract, withdrawing the bulk of its business from the Company and moving it to a new company owned and run by Jim Creagan and one other of the Company's key employees, which severely reduced the Company's revenues and caused it to ultimately go out of business.

C. Jim Creagan and Tressa Conrad have signed agreements that prevented them from competing with the Company, or using any of the Company's confidential, proprietary, and/or trade secret information when, in fact, Defendants knew that neither of them had done so (which had they done so, as represented by Defendants, would have allowed the Company to prevent Jim Creagan and Tressa Conrad (Company employees at the time of Closing) to steal the BPA business and move it to another entity). This representation was made several times, but it was first made by both D. Creagan and C. Creagan to Plaintiff's representatives Chad MacKay and Jim Nelson in September 2020. In this conversation, and reiterated at various times in September through December

(both in person and on the phone), Defendants represented that "all the Company's employees had signed the new NDAs", which included Jim Creagan and Tressa Conrad.  When Plaintiff's representatives asked for a copy of the new NDA Defendants gave them a copy.  In providing that copy, which happened in September or October of 2020, Chad MacKay and Jim Nelson asked C. Creagan and D. Creagan if every employee had signed the new NDA (which included non-compete, non-solicitation and confidentiality provisions) and both Defendants said "yes."  This was false, as not only had Jim Creagan and Tressa Conrad not signed the new NDAs, but Plaintiff learned after Closing that both of these individuals had told Defendants that they would not sign the new NDAs.  Had Defendants told the truth, and not made this misrepresentation, Plaintiff would not have gone through with the subject transaction and purchased the Equity Interest (especially because Defendants represented that these two employees were the key employees in handling BPA as a customer), thus saving for itself the Purchase Price and being able to use those monies to invest in other profitable adventures.  As a result of this misrepresentation, Plaintiff did purchase the Equity Interest and after Closing learned of BPA moving its business from the Company to Jim Creagan and Tressa Conrad's new business, which severely reduced the Company's revenues and caused it to ultimately go out of business.

D.  D. Creagan and Jim Creagan got along great, and after Closing would continue to work full-time to help the Company. Specifically, but without limitation, Defendants did not disclose that D. Creagan and Jim Creagan were so upset

with each other that they were not talking to each other before Closing and more importantly, that Jim Creagan was very unhappy with D. Creagan's actions and the Company and was planning on leaving the Company upon Closing. This representation was made several times, but it was first made by both D. Creagan and C. Creagan to Plaintiff's representatives Chad MacKay and Jim Nelson in August 2020. In this conversation, and reiterated at various times in August through December (both in person and on the phone), Defendants represented that "After Closing Jim and Dave will continue to work together full-time for the Company and will continue to manage the business, especially the BPA work, as they had been doing for years." If Defendants would have disclosed that D. Creagan and Jim Creagan were not only fighting, but Jim Creagan had already advised D. Creagan that he was leaving the Company after Closing Plaintiff would not have gone through with the subject transaction and purchased the Equity Interest, thus saving for itself the Purchase Price and being able to use those monies to invest in other profitable adventures. As a result of this misrepresentation, Plaintiff did purchase the Equity Interest and after Closing learned that Jim Creagan not only were not talking to each other, but that Jim Creagan was leaving the Company and taking with him the Company's BPA business, which severely reduced the Company's revenues and caused it to ultimately go out of business.

E. C. Creagan and D. Creagan had great health. Specifically, but without limitation, Defendants did not disclose that both of them had serious health problems that prevented them from working full-time for the Company after

Closing, let alone help the Company grow under its new ownership, something critical to Plaintiffs' decision to purchase the Equity Interest. This representation was made several times, but it was first made by both D. Creagan and C. Creagan to Plaintiff's representatives Chad MacKay and Jim Nelson in November 2020.  In this conversation, and reiterated at various times in November through December (both in person and on the phone) as the parties were negotiating the Employment Agreements, and in response to Plaintiff's question, "will you keep running the Company after Closing like you are running it now" Defendants answered the question by saying "yes," and further represented that "We will keep working full-time after Closing and are confident we'll be able to not just keep our existing work but earn a lot more work for the Company."  If Defendants would have disclosed that D. Creagan had diabetes and terrible health and/or that C. Creagan had substance abuse addictions Plaintiff would not have gone through with the subject transaction and purchased the Equity Interest, thus saving for itself the Purchase Price and being able to use those monies to invest in other profitable adventures.  As a result of this misrepresentation, Plaintiff did purchase the Equity Interest and after Closing learned that D. Creagan's health was terrible and he could not work full-time for the Company and that C. Creagan had such significant health issues/substance addiction issues that he checked himself into rehab for the first month after Closing, with these actions causing a huge loss of morale amongst the remaining employees of the Company and severely damaging the transition

of the Company to Plaintiff, which in the end severely reduced the Company's revenues and caused it to ultimately go out of business.

(Collectively "the Representations").

17. Had Defendants told the truth and not made any of the Representations, CPC never would have purchased the Equity Interest, and it would still have today all the money it paid to acquire the Equity Interest, as well as all of the monies CPC put into the Company to try to keep it a going concern.

18. As a result of Defendants' actions, the Company was destroyed.

19. Accordingly, Plaintiff has brought this action seeking damages and relief as set forth below.

### III.  CAUSES OF ACTION

#### COUNT I
**(Fraud in Connection with the Purchase and Sale of Securities under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

20. Plaintiff incorporates by reference the preceding paragraphs and the allegations included therein, as if the same were fully and completely set forth below.

21. Defendants used the means or instrumentality of interstate commerce to make untrue statements of material fact and omitted to state necessary facts to make statements made not misleading.

22. The Representations were made by Defendants, were false at the time they were made, were known to be false at the time they were made by those making them and were made to CPC to induce it to purchase the Equity Interest referenced above.

23. The Representations were made by Defendants with fraudulent intent to deceive and manipulate CPC to purchase the Equity Interest. The Equity Interest is a purchase of securities, i.e. stock in CPC (the "Securities").

24. The Representations were directly related to Defendants' efforts to induce CPC to purchase the Securities.

25. The Representations made would be viewed by a reasonable investor as having significantly altered the information available to such an investor, making the securities more attractive than they were.

26. CPC did not know and had no reasonable way of knowing the Representations were false statements.

27. CPC justifiably relied on the Representations when purchasing the Securities.

28. The Representations were the direct cause of injury to CPC. As set forth in greater and more specific detail above, the Representations caused CPC to purchase the Securities for $10,620,000 plus additional consideration; invest further money to keep the Company a going concern; invest thousands of hours in trying to save the Company; and precluded CPC from using the above monies and time to pursue other ventures which would have not only preserved their capital but significantly increased it. Had Defendants not made any of the Representations, CPC never would have purchased the Securities.

29. CPC's reliance on Defendants' Representations, which Representations Defendants knew were all false when made (and omissions which should have been disclosed prior to Closing) and were made as part of a scheme/pattern to induce CPC to purchase the Securities, has damaged CPC in an amount to be proven at the time of trial. In the alternative, CPC seeks recission of the Agreement, return of all the consideration it paid,

plus interest, attorneys' fees, costs and all other sums allowed under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## COUNT II
### (Violations of Delaware 6 *Del. C.* § 73-201)

30. Plaintiff incorporates by reference the preceding paragraphs and the allegations included therein, as if the same were fully and completely set forth below.

31. Defendants employed a device, scheme, or artifice to defraud CPC by making each of the Representations to CPC to induce it to purchase the Securities, when it knew each Representation was false when made.

32. Prior to Closing, and pursuant to the terms of the Agreement, Defendants made a number of untrue statements of material fact as well as omitted to state material facts necessary in order to make the statements made not misleading, as set forth in detail in the description of the Representations.

33. Defendants knew at the time they made them that the Representations were false.

34. The Representations and other statements and omissions made by Defendants were intended to deceive and manipulate CPC into purchasing the Securities.

35. CPC did not know and, exercising reasonable care, could not have known the Representations were false.

36. CPC justifiably relied on the Representations made by Defendants in purchasing the Securities. Defendants' Representations, which were false, were the direct cause of CPC's injury.

37. CPC's reliance on the Representations and other material misrepresentations and omissions has damaged it in an amount to be proven at the time of trial but which

amounts are described above. Further, CPC is entitled to all remedies allowed to victims of Delaware state securities fraud, as set forth in Delaware Title 6, Subtitle IV.

## COUNT III
### (Fraudulent Misrepresentation)

38. Plaintiff incorporates by reference the preceding paragraphs and the allegations included therein, as if the same were fully and completely set forth below.

39. In order to induce Plaintiffs into executing the Agreement and purchasing the Securities the Defendants made the Representations of fact to CPC, as described above.

40. Defendants, and each of them, intended for CPC to rely on these Representations, and CPC in fact so relied. CPC's reliance thereon was reasonable given the nature of the transaction.

41. The Representations were false as alleged above. Defendants, and each of them, knew, or should have known that they were false when they were made.

42. Had it known of the falsity of the Representations, CPC would not have executed the Agreement nor purchased the Securities.

43. The Defendants' false Representations, and CPC's justifiable reliance on the same, has caused CPC to suffer damages in an amount to be proven at trial.

## COUNT IV
### (Negligent Misrepresentation)

44. Plaintiff incorporates by reference the preceding paragraphs and the allegations included therein, as if the same were fully and completely set forth below.

45. In order to induce CPC into executing the Agreement and purchasing the Securities, Defendants made and/or ratified Representations of fact to Plaintiffs, as described above.

46. Defendants, and each of them, intended for CPC to rely on these Representations, and CPC, in fact so relied. CPC's reliance thereon was reasonable given the nature of the transaction.

47. The Representations were false as alleged above. Defendants, and each of them, should have known that they were false when they were made.

48. Had it known of the falsity of the Representations, CPC would not have executed the Agreement nor purchased the Securities.

49. Defendants' false Representations, and CPC's justifiable reliance on the same, has caused CPC to suffer damages in an amount to be proven at trial.

## COUNT V
### (Breach of Contract)

50. Plaintiff incorporates by reference the preceding paragraphs and the allegations included therein, as if the same were fully and completely set forth below.

51. Under the Agreement, Defendants made certain representations found primarily in Sections 2 and 3 of the Agreement. Defendants breached the Agreement by making a number of false representations in the Agreement including, but without limitation, the following:

   A) <u>Absence of Certain Changes</u>.  Major changes had occurred in the Company's relationship with BPA and its relationship with several key employees, as set forth in greater detail above;

   B) <u>Agreements, Contracts and Commitments</u>.  Contrary to Defendants' representation the Company's contract with BPA had problems and BPA was not going to adhere to the contract and pay the Company $51 million, as set forth in greater detail above;

    C) <u>Labor Matters</u>. Contrary to Defendants' representation the two key employees of the BPA contract did not signed the new and revised NDA, as set forth in greater detail above;

    D) <u>Affiliate Transactions</u>. Contrary to Defendants' representation two of its employees, Jim Creagan and Tressa Conrad had an agreement with BPA to move the Company's BPA work from the Company to their new entity after Closing, as set forth in greater detail above; and

    E) <u>Customers; Suppliers</u>. Contrary to Defendants' representation the Company's largest customer, BPA, had in fact given Defendants notice that it intended to terminate its contract with the Company after Closing, as set forth in greater detail above.

52. Under the Agreement, Defendants also agreed to indemnity and hold Plaintiffs harmless from the Claims. Defendants' refusal and/or failure to provide the promised indemnification also constitute breaches of contract.

53. As a result of Defendants' breaches of the Agreement, Plaintiff has been damaged in an amount to be proven at the time of trial.

54. The Agreement provides that the prevailing party in any dispute is entitled to recover its attorneys' fees and costs. Accordingly, Plaintiff also seeks recovery of its attorneys' fees and costs under the Agreement.

## IV.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief against the Defendants, jointly and severally, as follows:

1. For judgment and an award of damages suffered by Plaintiff, in an amount to be proven at trial;

2. In the alternative, recission of the Agreement and a return of the Purchase Price and other consideration paid by CPC to Defendants for the Equity Interests.

3. For Plaintiff's reasonable attorney fees and costs incurred as provided for by applicable statute and the Agreement;

4. For an award of prejudgment interest in the highest legal amount;

5. For judgment and an award of damages suffered by Plaintiff as a result of the destroyed value of the Company, in an amount to be proven at trial; and

6. Other such legal and equitable relief as deemed appropriate by the Court.

POTTER ANDERSON & CORROON LLP

H. Troy Romero
(admission *pro hac vice* forthcoming*)*
Romero Parks P.S.
1019 W. James Street, Suite 102
Kent, Washington 98032
(425)-450-5000

By: */s/ Jesse L. Noa*
    Jesse L. Noa (#5973)
    Tyler E. Cragg (#6398)
    Hercules Plaza – 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE  19801
    (302) 984-6000
    jnoa@potteranderson.com
    tcragg@potteranderson.com

*Attorneys for Plaintiff*

Dated:  December 29, 2023